UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 2:24-CR-19 |
| | ) | JUDGE CORKER |
| CHINAGOROM ONWUMERE | ) | |

## UNITED STATES' SENTENCING MEMORANDUM

The United States requests the Court to sentence defendant, Chinagorom Onwumere, to a sentence of 11 years. This is an upward departure or variance from the defendant's advisory guideline range, but nonetheless is a sentence that "is sufficient, but not greater than necessary," to comply with the statutory purposes of sentencing due to the overall nature of the scheme, the infliction of sheer cruelty on victims (many of whom are elderly adults), and the loss of life. *See* 18 U.S.C. § 3553(a).

### I. PROCEDURAL HISTORY

On February 13, 2024, the Grand Jury indicted defendant and his wife for conspiracy to commit offenses against the United States (false personation of a federal officer, aggravated identity theft, and aggravated stalking resulting in death), conspiracy to commit mail and wire fraud, conspiracy to commit money laundering, aggravated stalking resulting in death, substantive counts of mail fraud, substantive counts of wire fraud, substantive counts of money laundering, false personation of a federal officer, and substantive counts of aggravated identity theft. [*See* Presentence Investigation Report ("PSR"), Doc. 69 at ¶2]. On July 9, 2024, the Grand Jury returned a superseding indictment that charged codefendant Stephen O. Anagor with the same offenses. [*Id.* at ¶3].

On April 9, 2025, defendant pled guilty to the following offenses: conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349; aggravated stalking with resulting death in violation of 18 U.S.C. §§ 2261A(2)(B) and 2261(b)(1); money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and money laundering in violation of 18 U.S.C. § 1957. [*Id.* at ¶4]

Sentencing is set for November 19, 2025, at 2:30 p.m.

## II. FACTS

The facts are largely undisputed and are thoroughly detailed in the extensive factual basis set out in the parties' negotiated plea agreement [Doc. 54 at 4-19] as well as the PSR. [Doc. 69, at 6-17 ¶¶ 12 to 65]. The United States will present agent testimony at the sentencing hearing to oppose certain PSR objections from the defendant and to support certain PSR objections by the United States.

The factual basis summarizes the United States' theory of the offense. Namely, defendant met his codefendant Anagor during Army training at Fort Jackson in Columbia, South Carolina. Anagor recruited defendant to participate in a romance scam that Anagor's relative was operating from Nigeria. Defendant understood the Nigerian coconspirator made people fall in love on the computer and then swindled them. Defendant then recruited his wife to join the crime.

The Nigerian coconspirator (and potentially others in Nigeria) operated the scheme by posing as well-known celebrities. They would create an elaborate and false pretense that the victim and the impersonated celebrity were in a romantic relationship and would often request gift cards and payments on a number of false pretenses (*e.g.*, paying taxes for luxury vehicles, making donations to charities, purchasing exclusive memberships to the celebrity's club, payment for medical bills and hospital stays, payments for background checks and employment

2

agreement processing fees, etc.). Once convinced, victims would send money to coconspirators like Anagor, Onwumere, and Abdalkareem who were in the United States and had financial institution accounts that could be used to launder the funds. Once they deposited the fraud proceeds, they would keep a portion and direct transfers to others around the country and in Nigeria using electronic money transfer platforms like CashApp and known international platforms.

After victims were snared, the scam turned sinister. At this point, the Nigerian coconspirators would send emails purporting to be from high-level United States officials like the Director of the FBI and the Attorney General of the United States. They even would send pictures of sham law enforcement credentials and logos to bolster the impression that they were, in fact, the officials they were impersonating. The emails said that the celebrity's management team had reported the victim for harassment, that the FBI was investigating, and that the victim had to pay exorbitant fees to close the investigation and seal all the files.

Unfortunately, Victim 1, a retired teacher and coach, was targeted by the scheme. He sent defendant and defendant's wife three personal checks (including two that were made payable to the FBI) totaling $15,500 and two cashier's checks totaling $82,000. Defendant Onwumere tore up one of the FBI checks, took a picture, and sent it to the Nigerian coconspirator. The Nigerian coconspirator then used that photo to extort even more money from the victim. Defendants Onwumere and Abdalkareem altered another one of the checks payable to the FBI to make it look like it was payable to someone else. Defendant Abdalkareem even lied and told the bank that it was from a regular customer of hers to purchase a tour package.

3

Ultimately, Victim 1 sent his life savings, and while fraudsters were pretending to be the FBI, Victim 1 was simultaneously confiding in the same people (who were also posing as the celebrity) that he was suicidal, had betrayed his wife and family, and was going to end it all.

Without an ounce of pity, the scammers then told him that he had caused the celebrity so much stress that she was now hospitalized, and he was going to be responsible to pay her medical bills. Within minutes of receiving that email (purportedly from the Attorney General of the United States), Victim 1 advised the pretend celebrity that he did not have more money and was going to end it. He sent a chilling message the next morning saying the same thing, drove to a parking lot, put a pistol in his mouth, and killed himself.

This prosecution followed, and the Court must now determine a just punishment.

### III. STATUTORY SENTENCES AVAILABLE

Defendant is guilty of conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 1349. The maximum punishment for this offense is a term of imprisonment of up to 20 years, a fine of up to $250,000 or twice the gross loss or twice the gross gain from the offense, whichever is greater, a term of supervised release of up to three years, and a mandatory assessment of $100.

Defendant is also guilty of aggravated stalking resulting in death in violation of 18 U.S.C. §§ 2261A(2)(B), 2261(b)(1). The maximum punishment for this offense is any term of imprisonment up to life, a fine of up to $250,000 or twice the gross loss or twice the gross gain from the offense, whichever is greater, a term of supervised release of up to five years, and a mandatory assessment of $100.

Defendant is also guilty of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i). The maximum punishment for this offense is a term of imprisonment of up to

4

Case 2:24-cr-00019-DCLC-CRW   Document 122   Filed 10/31/25   Page 4 of 17
PageID #: 902

20 years, a fine of up to $500,000 or twice the value of the monetary instrument or funds involved, whichever is greater, a term of supervised release of up to three years, and a mandatory assessment of $100.

Defendant is also guilty of money laundering in violation of 18 U.S.C. § 1957(a). The maximum punishment for this offense is a term of imprisonment of up to 10 years, a fine of up to $250,000 or twice the gross loss or twice the gross gain from the offense, whichever is greater, a term of supervised release of up to three years, and a mandatory assessment of $100.

## IV. ADVISORY GUIDELINES

The sentence recommended by the United States under any circumstance will be an upward departure or variance based on U.S.S.G. §§ 2B1.1, comment. (n. 21(A)(ii)), 5K2.1 (Death), and 5K2.3 (Extreme Psychological Injury). The advisory guideline range currently computed in the PSR is a criminal history Category I with an ending offense level of 25, yielding an advisory guideline range of 57 to 71 months. [Doc. 23 ¶118]. The United States has filed separate objections requesting additional enhancements for using a means of identification to create another means of identification under U.S.S.G. § 2B1.1(b)(11)(C) (two levels), an offense involving a conscious or reckless risk of death or serious bodily injury under U.S.S.G. § 2B1.1(b)(16) (two levels), and a leadership-role enhancement under U.S.S.G. § 3B1.1(c) (two levels). If granted, the total offense level would be 30,[1] yielding a range of 97 to 121 months. Certain sealed matters and defendant's guideline objections could also affect the ending sentencing range. In short, if the Court agrees to depart or vary upwards, the ending guideline

---

[1] Although the United States' objections would call for an increase of six levels making the adjusted offense level for Group One 33, that would be nine levels lower for the score for Group Four, so the additional grouping point in paragraph 94 would not apply.

5

range will dictate how much that departure or variance is, but a departure or variance to 11 years is fully warranted in this case.

## V. 18 U.S.C. § 3553(a) FACTORS

When determining an appropriate sentence, the Court must consider the factors Congress has provided in 18 U.S.C. § 3553(a) (the "3553(a) factors"). These factors well support an 11-year sentence here.

### A. Nature and Circumstances of Defendant's Offenses

The Court first must consider the *nature* and *circumstances* of the offense. 18 U.S.C. § 3553(a)(1).

This factor readily supports the Government's recommendation. This is a very serious offense that caused over $300,000 of loss to at least eight victims, stole and used the identities of at least four well-known celebrities, and extorted money using the names and titles of two prominent government officials. Of course, apart from all that, the offense left an entire family mourning the loss of a dead relative.

Regarding the nature of the offense, the potential punishment Congress has authorized shows the crime is serious. Defendant faces life in prison on the aggravated stalking resulting in death, a Class A felony under the statutory sentencing scheme. *See* 18 U.S.C. § 3559(a)(1). Defendant faces up to 20 years in federal prison for his fraud and one of his money laundering offenses and 10 years in prison for the other money laundering offense, all Class C felonies under the statutory sentencing scheme. *See* 18 U.S.C. § 3559(a)(3).

Several guideline provisions also show the seriousness of the nature of the offense, even before considering specific offense characteristics. For instance, because of the serious, 20-year sentence defendant faces for the fraud count and one of the money laundering counts, the

6

Case 2:24-cr-00019-DCLC-CRW   Document 122   Filed 10/31/25   Page 6 of 17
PageID #: 904

advisory guideline base offense level is seven, not six. See U.S.S.G. § 2B1.1(a)(1). Also, because of the mere fact of his money laundering convictions, the Sentencing Commission mandates an additional two-level increase under U.S.S.G. § 2S1.1(b)(2)(B).

Both Congress and the United States Sentencing Commission, therefore, deem the nature of the offense (without considering anything more) to be serious.

The circumstances of the offenses, though, show the offense is far more serious than a normal fraud case. First, multiple specific offense characteristics show substantial aggravation. These include guideline increases (or requested increases) for losses exceeding $250,000, causing substantial financial hardship to at least one victim, impersonating a government official, committing a substantial part of the scheme from outside the United States, using a person's means of identification to create another means of identification, and committing an offense with a conscious or reckless risk of death. *See* U.S.S.G. §§ 2B1.1(b)(1)(G), (b)(2)(A), (b)(9)(A), (b)(10)(B), (b)(11)(C)(i), and (b)(16). For the stalking offense, an increase applies for a pattern of activity involving threatening or harassing the same victim. *See* U.S.S.G. § 2A6.2(b)(1)(E). Finally, a leadership role enhancement applies. *See* U.S.S.G. § 3B1.1(c). Some of these guideline aggravators merit additional discussion.

Loss amount generally drives the guideline score and reflects the need for the sentence to consider the seriousness of the offense and the need for just punishment in a fraud case. Regarding loss, the guidelines counsel that the more a person steals, the higher his or her sentence should be. Most state sentencing schemes reflect the same assumption. Here, the guidelines provide a 12-level increase for losses between $250,000 and $350,000. See USSG §2B1.1(b)(1)(G). The Sixth Circuit has correctly observed, "The purpose of these [2B1.1] loss gradations is to ensure that, the more harm the conduct at issue threatens [or causes], the more

7

Case 2:24-cr-00019-DCLC-CRW   Document 122   Filed 10/31/25   Page 7 of 17
PageID #: 905

severely it is punished. In essence, '[t]he Guidelines use loss as a proxy for the seriousness of the fraud.'" *United States v. Simpson*, 538 F.3d 459, 464 (6th Cir. 2008) (citation omitted).

A few additional observations about loss are pertinent here. First, the loss amount is spread among multiple victims. While Victim 1's losses account for about a third of the known losses, there were other victims, too.

Another observation is that most of the loss here is actual loss. The guidelines do not distinguish between actual and intended loss. *See* U.S.S.G. § 2B1.1(b)(1)(A) (using "the greater of actual loss or intended loss."). The rationale is clear—when judged from the intended harm, no meaningful difference exists between stealing and attempting to steal. While true, the losses here were not just an attempt. Defendant stole real money from real people. That makes the crime more aggravated when viewed from the perspective of those who lost their personal savings. A victim's expectation of just punishment is more pronounced when they lose money versus when they dodged a scam artist's attempt. Defendant's infliction of real harm makes the need for serious punishment greater.

Another guideline aggravating factor is causing substantial financial hardship. U.S.S.G. § 2B1.1(b)(2)(A). No question exists that the money defendants stole from Victim 1 caused a substantial financial hardship. They stole his life savings, and he even had to take a loan out on his used pick-up truck to come up with enough money for the final payment they demanded. Victim 2 has reported that this scam ruined his credit, resulted in a second mortgage on his home, and left him in a financial crisis well into his retirement. Victim 4 similarly reported that the $14,000 he sent was his life savings, too. The guideline increase does not adjust for substantial financial hardship to multiple victims until there are five or more. *See* U.S.S.G. §

8

2B1.1(b)(2)(B).  The Court, however, can take into account the substantial financial hardship the offense caused to other victims.

Related to loss and substantial financial hardship, this scam primarily defrauded elderly victims.  Financial crimes against elderly adults are a big (*i.e.,* serious) problem.  In a 2024 report, *Protecting Older Consumers*, the Federal Trade Commission summarized, "Consumers reported losing over $10 billion to fraud in 2023. About 43% of fraud reports filed in 2023 included consumer age information. About 35% (392,742) of reports that included age information came from people 60 and older, and their reported losses totaled more than $1.9 billion, up from about $1.6 billion in 2022."  Protecting Older Consumers, at 17 (Fed. Trade Comm'n, Oct. 18, 2024).  The FTC then noted, "Because the vast majority of frauds are not reported, these numbers include only a fraction of older adults harmed by fraud."  *Id.*

The most recent reporting from the FBI is similar.  In 2023, the numbers looked like this:



Fed. Bur. of Inv. Elder Fraud Rep., at 5 (FBI 2023) (available at https://www.ic3.gov/annualreport/reports/2023_ic3elderfraudreport.pdf) (last viewed on Oct. 30, 2025). Of these cases, there were 6,740 reported romance scams (such as the celebrity scams used here) and 3,517 reported government impersonation scams (also like the scheme employed here). *Id.* at 7. No one can argue that schemes targeting elderly people are not serious, and the heinousness of that kind of fraud makes the crimes more worthy of substantial sentences.

Another consideration is that the same guideline that provides for an increase for substantial financial hardship also makes provision for an increase when the offense targets multiple victims. *See* U.S.S.G. § 2B1.1(b)(2)(A). Here, the PSR catalogs eight victims who lost money. The offense used the identities of four celebrities and two high-ranking government officials. Under guideline commentary, these people are deemed victims too. *See id.* comment. (n.4(E)). While that analysis is not necessary to trigger the two-level increase for the guideline score, the number of victims is highly relevant to the question of how serious the offense was and the need for just punishment. Like loss, more victims demonstrate a need for a higher sentence.

The next aggravation is steps taken to conceal the scheme and make investigation much more difficult. This took several forms. First, the scheme was operated from both Nigeria and the United States, a fact captured by the guideline specific offense characteristic in 2B1.1(b)(10)(A). Other steps taken included attempts to alter and deposit a check, using multiple bank accounts and a sham company to carry out the scheme, and the web of subsequent money transfers within the United States and abroad.

Another non-guideline aggravator is the frequency with which defendants stole. At least eight victims reported multiple thefts as part of the scheme. Each time defendants had the

10

opportunity to stop, but their greed and desire for quick money counseled them in a different direction.

Accordingly, the serious nature of the offense and the guideline and non-guideline aggravating circumstances noted above would well support any sentence at the top of the defendants' properly computed guideline range.  The United States, however, is seeking an upward departure or variance.  This is supported by two independent grounds, the extreme psychological injury caused to multiple people by the offense and the ultimate harm—the death of Victim 1.

For psychological injury, Guideline 5K2.3 permits an increase for this type of harm and notes, "If a victim or victims suffered psychological injury much more serious than that normally resulting from commission of the offense" a departure may be warranted.  U.S.S.G. § 5K2.3. That is the case here for multiple victims here.  Victim 1 committed suicide because of the stress the offense caused.  Paragraphs 43 to 49 of the PSR document the psychological harm caused. More than Victim 1, though, Victim 2 reported that the pain and regret he now lives with weighs on him daily.  Victim 4 reported that he suffered a nervous breakdown from this scheme.  The scheme these defendants participated in was as sinister as it was financially damaging to victims. This is a particular type of aggravation that the Court can, and should, weigh when imposing sentence.

Of course, what puts this case among the most serious is the needless death of Victim 1. Loss of life is the weightiest sentencing factor here.  Our laws make this clear.  In a publication about life sentences from the Sentencing Commission, an appendix lists 50 federal crimes for which life sentences are authorized.  Apart from offenses involving drugs, firearms, sexual assaults, robbery, and piracy, the common denominator is loss of life.  *See* Life Sentences in the

11

Case 2:24-cr-00019-DCLC-CRW    Document 122    Filed 10/31/25    Page 11 of 17
PageID #: 909

Fed. Sys., at 32-35 (United States Sent. Comm'n July 2022) (available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220726_Life.pdf) (last viewed on Oct. 30, 2025). Of note, a life sentence is specifically authorized here for the aggravated stalking count because a death resulted. *See* 18 U.S.C. §§ 2261A(2)(B) and 2261(b)(1).

The nationwide consensus of our laws makes sense when viewed from the lens of those who are affected by death—the widow left behind, the family left without their relative, the community that lost a productive member, and the former students that lost a cherished teacher and coach. Money, of course, can be replaced. A living, breathing human being cannot. The best way to articulate and weigh this harm is the question asked by Victim 1's widow, "How do you put a dollar value on someone's life?" That is the question that drives the need for an upward departure or variance here.

The policy statement in U.S.S.G. § 5K2.1 recognizes this need. The policy statement notes that "the court may increase the sentence above the authorized guideline range" for a resulting death. The guideline cautions, however, that "[l]oss of life does not automatically suggest a sentence *at or near the statutory maximum."* U.S.S.G. § 5K2.1. Thus, a sentence for an offense involving a person dying is normally not a debate about where in the guideline range an offense falls but a debate about how much of the maximum sentence is required to capture the seriousness of the offense.

The government's recommendation follows this advice. While the United States is requesting an above-guideline sentence, the United States is not requesting a maximum sentence of life and is recommending about half of the statutory maximums of 20 years for the fraud and money laundering offenses, even less a percentage for the aggravated stalking offense. All told,

12

the government's recommendation would be akin to a sentence for a voluntary manslaughter—an offense for which the maximum sentence is 15 years. *See* 18 U.S.C. § 1112(a).

A few other points about the death are in order. First, the United States has requested that the specific offense characteristic under guideline 2B1.1 for an offense involving a conscious or reckless risk of death apply. *See* U.S.S.G. § 2B1.1(b)(16). That enhancement addresses the risk of death, not an actual death. The 2B1.1 guideline commentary makes clear that an actual death is different and supports departing upward. *See* U.S.S.G. § 2B1.1, comment. (n. 21(A)(ii).

Second, because of the seriousness of the fraud offense (even with no death), the guideline for the aggravated stalking charge (that carries a potential life sentence) will be, surprisingly, more than nine levels lower than the guideline score for the fraud offenses. That means that no points will be assessed for the count that expressly includes Victim 1's death. Even if the Court denied the United States' guideline objections, Victim 1's death would result in just a one-point increase under the counting rules of U.S.S.G. § 3D1.4. Put differently, the substantial financial hardship caused to Victim 1 would end up as a weightier sentencing factor under the guidelines than his actual death.

The Court can (and should) remedy that anomaly by an upward departure or variance. The guidelines expressly envision that with a guideline commentary and a policy statement.

### B. Defendant's History and Characteristics

The Court also must consider defendant's history and characteristics. 18 U.S.C. § 3553(a)(1). Defendant, no doubt, has accepted responsibility for his crimes by his guilty pleas.

Turning to his background, defendant is from Nigeria and has been in the United States since October 2022 (less than a year before he began committing crimes). He has children in

13

Kansas, Nigeria, and Kenya from at least three different women. He had a short-term military stint that ended when these charges became known, and he worked at two other jobs while in the United States.

He has no prior criminal record. He does not qualify as a zero-point offender, though, because this offense here was too serious—it resulted in death and resulted in a substantial financial hardship. *See* U.S.S.G. § 4C1.1(4), (6). Some offenses—particularly those that involve a death or stealing someone else's life savings—are too heinous regardless of a person's actual criminal record.

In short, while nothing about defendant's other history and characteristics are aggravating, nothing stands out as truly mitigating either. No mental or emotional conditions exist (*see* U.S.S.G. § 5H1.3); no physical conditions are present (*see* U.S.S.G. § 5H1.4); and defendant has no extraordinary family commitments (*see* U.S.S.G. § 5H1.6). While defendant did serve in the military for a brief period (*see* U.S.S.G. § 5H1.11), that service was unremarkable in terms of quality and duration. No extraordinary civic, charitable, or public service (*see id.*) merit any further departures either.

### C. Need to Address the Statutory Purposes of Sentencing

The court must also consider the statutory purposes of sentencing, including the need for the sentence to reflect the seriousness of the crime, to promote respect for the law, to provide just punishment, to provide deterrence, and to protect the public from future crimes. *See* 18 U.S.C. § 3553(a)(2).

The seriousness of the crime is outlined above and in the United States' objections and motion for upward departure or variance. Just punishment is now needed, and the United States recommended 11-year sentence will provide that.

14

Case 2:24-cr-00019-DCLC-CRW    Document 122    Filed 10/31/25    Page 14 of 17
PageID #: 912

The parties' agreement also will promote respect for the law. This is particularly needed if, for no other reason, general respect for the law by the public.

Specific and general deterrence and the need to protect the public from future crimes are weighty here also. The crimes here were not a mistake and were repeated frequently over several months from June through arrest in November. This was not a one-off offense.

General deterrence is also important. The Sixth Circuit has noted that financial crimes are "prime candidates for general deterrence" because they are the result of "rational, cool, and calculated" decision making. *United States v. Peppel,* 707 F.3d 627, 637 (6th Cir. 2013) (internal quotation marks omitted); *accord United States v. Musgrave,* 761 F.3d 602, 609 (6th Cir. 2014); *United States v. Davis,* 537 F.3d 611, 617 (6th Cir. 2008).

Importantly, Victim 1's death heightens the need for the sentence to promote respect for the law, specific deterrence, and general deterrence. Any loss of any life is serious, but—sadly—suicides by seniors who fall victims to scams like this are becoming all too common. A series of anecdotal stories with accompanying newscasts was collected by a recent article put out by the Senior Center in Washington, D.C. *See Senior Scams Contributing to Suicide Among Older Adults* (available at https://theseniorscenter.blog/2019/04/18/senior-scams-contributing-to-suicide-among-older-adults/) (last viewed on Oct. 30, 2025). The Court should consider that fact patterns like this are becoming more frequent and should send a strong message of deterrence to anyone who is considering engaging in crimes like this.

### D. Need to Avoid Unwarranted Sentencing Disparities

The Court's sentence also must avoid unwarranted sentencing disparities between offenders with similar records who commit similar crimes. *See* 18 U.S.C. § 3553(a)(7).

15

The advisory guidelines, of course, are the starting point for this factor. A primary reason why Congress established the United States Sentencing Commission and authorized promulgated guidelines was to provide "*reasonable* uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses by similar offenders." USSG Ch.1, Part A, intro. comment. (n.3) (emphasis added). Indeed, when considering this factor, the Court needs only to correctly compute the advisory guidelines. "For when a district court correctly does so, it has 'necessarily taken into account the need to avoid unwarranted sentence disparities, viewed nationally.'" *United States v. Hymes*, 19 F.4th 928, 935 (6th Cir. 2021) (quoting *United States v. Houston*, 529 F.3d 743, 754 (6th Cir. 2008)).

Here, the United States is requesting an upward departure or variance, but that request is being made for each defendant. Any other sentencing discrepancies will flow from normal sentencing considerations at play with any multi-defendant case.

### E. Restitution

18 U.S.C. § 3553(a)(7) requires the Court to consider the need for restitution. Much like Victim 1's loss of life, the substantial funds stolen appear equally lost, as defendant appears to have no reals means of repaying the victims.

## VI. CONCLUSION

The United States recommends that the Court impose a punishment of 11 years in prison. While this is an upward departure or variance, it nonetheless is a sufficient sentence under all the 3553(a) factors. These offenses caused real financial harm, real emotional harm, and for Victim

1, they cost him his life.

    Respectfully submitted, this the 31st day of October, 2025.

                                        FRANCIS M. HAMILTON III
                                        UNITED STATES ATTORNEY

                        By:    */s/ Mac D. Heavener III*
                                        Mac D. Heavener III (FL Bar #0896748)
                                        Assistant United States Attorney
                                        220 West Depot Street, Suite 423
                                        Greeneville, TN 37743
                                        (423) 639-6759
                                        Email: mac.heavener@usdoj.gov