UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | 2:24-CR-00019-DCLC-CRW |
| | ) | |
| v. | ) | |
| | ) | |
| CHINAGOROM ONWUMERE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on the United States' Objections to the Presentence Report [Doc. 81] and Defendant Chinagorom Onwumere's Objections to the Presentence Report [Doc. 84]. At the November 19, 2025 hearing, the Court heard arguments from the parties on both sets of objections. These matters are now ripe for consideration.

**I.   Background**

On July 9, 2024, a federal grand jury returned a thirty-eight count superseding indictment charging Onwumere and his coconspirators Stephen Anagor and Salma Abdalkareem with numerous offenses for their role in an international romance scam. The scam resulted in the loss of nearly $400,000 from seven victims,[1] one of whom committed suicide as a result. [Doc. 30]. On March 24, 2025, Onwumere entered into a Plea Agreement whereby he pled guilty to Count 2 (Conspiracy to Commit Mail and Wire Fraud), Count 4 (Aiding and Abetting Aggravated Stalking

---

[1]   This number is the total restitution owed to the victims and is not the individual loss amount attributed to Onwumere.

Resulting in Death), Count 29 (Aiding and Abetting Money Laundering), and Count 30 (Aiding and Abetting Money Laundering). [Doc. 54].

In the Plea Agreement, Onwumere admitted to the following facts describing how the scam operated and his role within it. Onwumere, originally from Nigeria, followed his wife, codefendant Abdalkareem, to the United States where he joined the New Jersey National Guard. During basic training, he met and befriended codefendant Anagor, who shared with him a way to make money: Anagor's relative in Nigeria, identified as Coconspirator 1, made people "fall in love" on the computer and obtained money from them. For a cut of that money, individuals in the United States with domestic bank accounts received and laundered checks the victims mailed to them. Onwumere agreed to launder funds through accounts owned by him and Abdalkareem.

Onwumere did not know the specifics of how and when Coconspirator 1 and others were communicating with victims; however, he did know the funds he was depositing were the proceeds of fraudulent activity. When he received checks from the victims of the scam, he deposited the funds into his bank accounts, kept a portion, and sent electronic transfers of the remainder to other accounts and individuals. Onwumere performed these tasks himself and at times directed Abdulkareem to do so.

Victim 1 was a retired teacher from Jonesborough, Tennessee who fell victim to the romance scam and believed he was in a relationship with a celebrity. As part of the scam, coconspirators in Nigeria sent Victim 1 nude photos, purporting to be the celebrity. A few weeks after sending the photos, the scammers then impersonated high-level federal law enforcement officials claiming that the photos leaked to the public and that Victim 1 was the prime suspect. The scammers harassed and threatened Victim 1 with criminal action if he did not pay a series of fines. Neither Onwumere nor his codefendants knew these communications were occurring. On October

4, 2023, Victim 1 mailed Abdalkareem and Onwumere three personal checks. These checks were identified as check number 2515, made payable to the FBI and with the memo line reading "Agent Salma Abdalkareem," in the amount of $5,500; check number 2516 for $4,500 made payable to Salmasam LLC, a business owned by Abdalkareem; and check number 2517, again made payable to the FBI for $5,500. They received these checks via the mail at their residence, and an envelope from Victim 1 addressed to the FBI's Department of Payments/Fees was found at their home. Abdalkareem and Onwumere altered check number 2515, changing the payee from "FBI" to "FBED Salma Abdalkareem." Abdalkareem attempted to deposit the check, but the bank denied it due to the alteration. During a later call with the bank, Abdalkareem lied to the financial investigator, telling him that she had done business with Victim 1, had booked a travel package for him, and that he would be issuing a new check. Onwumere endorsed and deposited check number 2516 and tore up check number 2517 after realizing it was made payable to the FBI. Onwumere then sent a photo of the torn-up check to Coconspirator 1.

  The coconspirators in Nigeria continued to threaten Victim 1. Purporting to be the Attorney General of the United States, they claimed the Supreme Court ordered Victim 1 to pay tens of thousands of dollars or else he would need to testify in front of his family and the world about the nude photos and his affair with the celebrity. The day after Victim 1 issued the three personal checks, he obtained a cashier's check for $41,000, made payable to Onwumere. The day after that, he obtained a second cashier's check, also for $41,000 but payable to Abdalkareem. This money was Victim 1's life savings. Onwumere deposited the first check, and Abdalkareem endorsed and deposited the second. The scammers relentlessly continued to demand more and more money from Victim 1. Just over two weeks after issuing these checks, Victim 1 sent two suicidal messages to

the Nigerian coconspirators, believing it to be the celebrity he was in a romantic relationship with. And on October 23, 2023, he committed suicide.

Victim 1 was one of many victims of this scam. At least seven other victims exist, with five who sent funds to Onwumere and Abdalkareem. In total, the Government seeks $388,500 in restitution for the identified victims.

On October 2, 2025, the Probation Officer issued the Presentence Investigation Report (PSR), to which both the Government and Onwumere raised multiple objections. The Court will address each objection in turn.

## II. Legal Standard

Under Federal Rule of Criminal Procedure 32(i)(3)(B), after a party files objections to the PSR, the Court must either rule on the disputed portions of the PSR or determine that a ruling is unnecessary either because the matter will not affect sentencing or because the Court will not consider the matter in sentencing. Fed. R. Crim. P. 32(i)(3)(B). The sentencing court's factual findings "help to ensure that defendants are sentenced on the basis of accurate information and provide a clear record for appellate courts, prison officials, and administrative agencies who may later be involved in the case." *United States v. Monus*, 128 F.3d 376, 396 (6th Cir. 1997) (internal quotation marks and alterations omitted). The Court must make factual findings by a preponderance of the evidence. *United States v. White*, 492 F.3d 380, 416 (6th Cir. 2007).

## III. The Government's Objections

### A. Objection One (Means of Identification Enhancement)

The United States argues that a two-level increase under U.S.S.G. § 2B1.1(b)(11)(C)(i) for using a means of identification unlawfully to create another means of identification applies to Onwumere. As the Court announced during the hearing, this objection is **OVERRULED**, because

there is no evidence that Onwumere created the fraudulent FBI card, that he agreed to its creation, or that he even knew it existed. Additionally, as the Probation Officer noted in the PSR Addendum, Onwumere's offense level has already been enhanced because the offense involved the misrepresentation that he was acting on behalf of a government agency. To apply the § 2B1.1(b)(11)(C)(i) enhancement would constitute impermissible double counting. *See United States v. Duke*, 870 F.3d 397, 404 (6th Cir. 2017) ("Impermissible doubling counting occurs when precisely the same aspect of a defendant's conduct factors into his sentence in two separate ways.").

### B. Objection Two (Conscious of Reckless Risk of Death Enhancement)

The Government contends that the two-level enhancement for conscious or reckless risk of death under U.S.S.G. § 2B1.1(b)(16)(A) applies. This guideline applies to fraud offenses, and provides, "If the offense involved … the conscious or reckless risk of death or serious bodily injury… increase [the offense level] by 2 levels." U.S.S.G. § 2B1.1(b)(16)(A).

Several Circuit Courts of Appeal have addressed the meaning of § 2B1.1(b)(16)(A), and the majority interpret the enhancement to require that the defendant was either subjectively aware of the risk created by her conduct or objectively reckless in disregarding a risk that would have been obvious to a reasonable person. *United States v. Maestas*, 642 F.3d 1315, 1321 (10th Cir. 2011); *see United States v. Lucien*, 347 F.3d 45, 56-57 (2d Cir. 2003) (holding that the enhancement applies only when the conduct created a risk of bodily injury and that the defendant either knew of the risk (conscious) or disregarded a risk that would have been obvious to a reasonable person and whose disregard constituted a gross deviation from reasonable care (reckless)); *United States v. Johansson*, 249 F.3d 848 (9th Cir. 2001) (holding that a defendant does not need to subjectively know that her conduct created a serious bodily risk). The Sixth

Circuit has described these various approaches but has not expressly adopted one. *United States v. Silber*, 456 F. App'x 559, 563 (6th Cir. 2012).

As the Tenth Circuit explained in *Maestas*, "[a] defendant's conduct involves a conscious risk if the defendant was subjectively aware that her conduct created a risk of serious bodily injury," while conduct involves a reckless risk "if the risk of bodily injury would have been obvious to a reasonable person." *Maestas*, 642 F.3d at 1321. Under this framework, reckless conduct is measured by an objective standard. *Id*. The Sixth Circuit has held that § 2B1.1(b)(16)(A) requires that the reckless risk be "actual, not conjectural." *United States v. Sosa-Baladron*, 800 F. App'x 313, 330 (6th Cir. 2020) (citing *United States v. Vivit*, 214 F.3d 908, 922 (7th Cir. 2000)). And the focus of the analysis must be on the "actual *risk* of serious bodily injury, not on whether there were actual injuries." *Id.*

Under § 1B1.3(a)(1)(A), a defendant is responsible for his own acts committed, aided, and abetted. Onwumere's acts were simple: he received checks in the mail, deposited them, and transferred the money to his coconspirators, retaining a portion for herself. He altered one check from Victim 1 to conceal that it was payable to the FBI. He also recruited his wife to the conspiracy and at times directed her actions. In performing these actions, Onwumere had personal knowledge that his coconspirators were performing romance and law enforcement scams, and he knew the money he received was the proceeds from these illegal scams.

Under § 1B1.3(a)(1)(B), Onwumere is also responsible for all acts and omissions of others that were within the scope of the jointly undertaken criminal activity, in furtherance of that criminal activity, and reasonably foreseeable in connection with that criminal activity. This guideline allows sentencing courts to consider the acts of others that satisfy these requirements, as well as all harms resulting from those acts; however, courts cannot consider the acts of others outside the conspiracy.

U.S.S.G. §§ 1B1.3(a)(1)(B), 1B1.3(a)(3). Here, Onwumere initially agreed to launder money for a romance scam. His coconspirators' messages to victims that were romantic in nature, impersonating celebrities, and asking for money in relation to the romantic relationship were within the scope of the jointly undertaken criminal activity, in furtherance of the activity, and were reasonably foreseeable to him. Further, on or around October 4, 2023, when he received the first check made payable to the FBI, Onwumere knew his coconspirators were performing a law enforcement scam. When he altered one of the checks to the FBI, destroyed another and sent a picture of it to a coconspirator, he personally participated in this law enforcement scam. Thus, the scope of the jointly undertaken criminal activity grew to include the law enforcement component, and Onwumere is also responsible for the messages by his coconspirators impersonating law enforcement officers and making demands and threats for money under that scheme.

However, Onwumere is not responsible for all acts committed by his coconspirators under § 1B1.3(a)(1)(B), and their knowledge of Victim 1's mental state cannot be imputed to him. Victim 1's suicidal messages to the Nigerian coconspirators—and their responses—were not within the scope of the jointly undertaken criminal activity, nor were they reasonably foreseeable to Onwumere. Accordingly, he cannot be held accountable for those communications, and the Nigerian coconspirators' awareness of Victim 1's suicidal condition cannot be attributed to him.

Upon consideration of both his own acts and those of his coconspirators that he is responsible for under § 1B1.3(a)(1)(B), the enhancement does not apply to Onwumere.

First, there is no evidence that Onwumere had a subjective awareness that his conduct created a risk of death. The Nigerian coconspirators knew that Victim 1 was suicidal because he communicated suicidal thoughts directly to them, but Onwumere was never privy to those

messages. He did not know that his conduct contributed to Victim 1's suicide, nor did he have broader knowledge that his participation in the scheme created a risk of death to any victim.

Second, the Government has not shown, by a preponderance of the evidence, that Onwumere acted **recklessly** with respect to a risk of death. Onwumere participated in the conspiracies to commit wire fraud and to aid and abet money laundering. Through his role, he learned information about the general nature of the scheme and some details about Victim 1. He knew that the coconspirators were carrying out a romance scam targeting U.S. citizens and that the checks mailed to him were proceeds of that fraud.

Victim 1's checks revealed additional details about the scheme. On or about October 4, 2023, Onwumere received a $5,500 check payable to the FBI, at which point he knew the coconspirators had shifted from a romance scam to a law-enforcement–based scam. The other checks dated the same day showed that Victim 1 was facing repeated monetary demands under this false law-enforcement pretense. Within two days, Onwumere and Abdalkareem received two additional checks from Victim 1—each for $41,000. This rapid escalation in payments is troubling and is the sort of development that might cause a reasonable person to question what pressures the victim was facing. Taken together, these facts created a risk that the victim might become emotionally distressed or overwhelmed. However, they did not create an obvious risk of death.

The only information Onwumere knew about Victim 1 was his name and address. He had no knowledge of the victim's mental condition, whether the $86,500 he deposited represented the victim's life savings or only a fraction of his resources, or what specific messages the victim exchanged with the Nigerian coconspirators. Based on the information available to him, a reasonable person in his position would have had no reason to believe—other than the general

awareness that some romance or law-enforcement scams have led to suicides—that this particular scheme, or his conduct within it, created an obvious risk of death.

Section 2B1.1(b)(16)(A) is typically applied where there is a clear and direct connection between the fraud offense and a risk of physical harm. *See, e.g., United States v. Chin*, 41 F.4th 16 (1st Cir. 2022) (enhancement applied to a pharmacist who knowingly sold contaminated drugs); *United States v. Hernandez*, 606 F. App'x 230 (5th Cir. 2015) (enhancement applied to a prison guard who falsified safety-check reports for an inmate he knew was suicidal); *United States v. Lucien*, 347 F.3d 45 (2d Cir. 2003) (enhancement applied to defendants who staged deliberate car accidents). Unlike those cases, nothing about this fraud scheme inherently or obviously posed a risk of death or serious bodily injury. Apart from the suicidal messages that Onwumere never saw, the scheme did not differ meaningfully from other romance or law-enforcement scams in terms of lethal risk. Although some victims of similar scams have committed suicide, there are no facts—known to Onwumere—that created a particular or obvious risk of suicide in this case.

That Victim 1 in fact committed suicide does not alter the analysis. As the Sixth Circuit has explained, § 2B1.1(b)(16)(A) focuses on whether the offense created a risk of death, not on whether death actually occurred. *United States v. Sosa-Baladron*, 800 F. App'x 313, 330 (6th Cir. 2020). While it is foreseeable that someone who sends $97,500 to supposed federal law enforcement agents may experience severe emotional or financial distress, the enhancement applies only when the offense creates a risk of death or serious bodily injury, not merely emotional harm.

The Government contends that because Onwumere pled guilty to Aiding and Abetting Aggravated Stalking Resulting in Death, "little argument exists that this offense did not involve a conscious or reckless risk of death." [Doc. 81, pg. 5]. However, § 2B1.1(b)(16)(A) only applies to

the *fraud* offense at issue – here the charge of conspiracy to commit mail and wire fraud – not the separate aggravated stalking offense. *See* § 2B1.1 (this section of the sentencing guidelines applies to the economic offenses of "Larceny, Embezzlement, and Other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States."). There is no dispute that aggravated stalking resulting in death involves the conscious or reckless risk of death. But that conduct is distinct from the mail-and-wire fraud offense the Government seeks to enhance.

The Government cites to *United States v. Cardena-Garcia* in support of its argument; however, in that case, the sentencing enhancement was applied to the same offense that involved a death. 362 F.3d 663, 665-67 (10th Cir. 2004) (applying a similar enhancement when a defendant was charged with transporting aliens unlawfully present in the United States for financial gain resulting in death). Here, by contrast, there is no evidence that Onwumere's conduct in committing the fraud conspiracy created created a conscious or reckless risk of death.

His offenses did not create an obvious risk to a reasonable person that her victims would commit suicide or otherwise face death or serious bodily injury. Therefore, the Government's objection is OVERRULED.

### C. Objection Three (Leadership Role Enhancement)

The Government also contends that a leadership role enhancement should apply to Onwumere under U.S.S.G. § 3B1.1(c). To qualify for this enhancement, the defendant must be an organizer, leader, manager, or supervisor of criminal activity that involved fewer than five participants or was not otherwise extensive. U.S.S.G. § 3B1.1(c). In evaluating this, the Court should consider things like "the exercise of decision making authority, the nature of participation

in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." *United States v. Hernandez*, 227 F.3d 686, 699-700 (6th Cir. 2000) (quoting U.S.S.G. § 3B1.1, Comment. (n. 4)). The guideline commentary further provides that the defendant will qualify for the enhancement if he was the organizer or leader "of one or more other participants." U.S.S.G. § 3B1.1, Comment. (n.2).

While Onwumere recruited his wife into the scheme, he did not maintain a leadership role over her. Abdalkareem acted independently and at times took a more involved role than Onwumere. On her own accord, Abdalkareem deposited some of the checks into her own bank accounts, and she took the initiative during the bank's investigation into Victim 1's altered check to the FBI when she lied to the bank's investigator. Further, she negotiated directly with the coconspirators to retain a larger share of the proceeds.

Rather than a leader-follower relationship, Onwumere and Abdalkareem acted like partners. They shared in the responsibilities as they both equally acted to deposit the checks they received into their joint and separate bank accounts, and as spouses they shared equally in their cut of the proceeds. Any evidence of Onwumere's control over Abdalkareem is weakened by their spousal relationship. *See United States v. Johnson*, 64 F.4th 1348, 1353 (D.C. Cir. 2023) (affirming the district court's decision not to apply the manager or supervisor role enhancement when the defendant exercised minimal control over his wife in the offense).

Upon review of the full scope of Onwumere and Abdalkareem's relationship and joint participation in the scam, Onwumere did not act as a leader sufficient to justify a leadership role enhancement. Therefore, this objection is **OVERRULED.**

### D. Objection Four (Guideline Calculations)

The Government objects to the offense level calculation based on its previous two objections. After overruling the objections, the original offense level calculation remains correct.

### E. Objection Five (Additional Grounds for Upward Departure)

The Court will address any variances and grounds for upward (or downward) departure at Onwumere's sentencing hearing on December 2, 2025.

## IV. Defendant's Guideline Objections

### A. Loss Amount

Onwumere first objects to the PSR's loss amount calculation. The guidelines define loss as the greater of actual loss or intended loss. U.S.S.G. § 2B1.1(b)(1) n. (A). Actual loss is the reasonably foreseeable pecuniary harm that resulted from the offence and intended loss is the harm that the defendant purposely sought to inflict. U.S.S.G. § 2B1.1(b)(1) n. (C). However, when "a fraud involves both successful and unsuccessful attempts, total loss may include both actual and intended losses." *United States v. Vysniauskas*, 593 F. App'x 518, 525-26 (6th Cir. 2015); *see United States v. You*, 74 F.4th 378, 397-98 (6th Cir. 2023) (holding that loss includes intended loss). Because intended loss includes all actual losses, courts must be careful not to double count. *Vysniauskas* 593 F. App'x at 525. Onwumere claims that only the losses he and Abdalkareem received or deposited should count towards the total loss amount. However, under U.S.S.G. § 1B1.3(a)(1)(B), the Court must take into account all acts of others that were within the scope of the jointly undertaken criminal activity, in furtherance of that activity, and reasonably foreseeable in connection with the activity.

Onwumere, and through him, Abdalkareem, agreed to launder money for the international romance scam in June 2023. Onwumere knew the scam was larger than just him and his wife: he

knew Anagor was involved, and he sent portions of the proceeds to others in the United States and Nigeria. The actions of the Nigerian coconspirators in threatening and demanding money from their romance scam victims, and the actions of American coconspirators in depositing and laundering the scammed funds are within the scope of the jointly undertaken criminal activity. Both sets of actions were necessarily in furtherance of the criminal activity and were reasonably foreseeable to Onwumere. Therefore, all losses related to the scams that occurred during the time of his involvement and can be connected in some manner to Onwumere should be calculated in the loss amount. *See United States v. Ellis*, 817 F. App'x 780, 789 (11th Cir. 2020) (holding that the district court properly calculated the loss amount from romance and other scams by considering the losses that occurred when the defendants were part of the conspiracy and for losses connected "in some manner" to them).

The following table presents the applicable losses:

| Date | Victim | Description | Actual Loss | Intended Loss |
|---|---|---|---|---|
| 8/17/2023 | 1 | Visa gift card | $400 | |
| 10/4/2023 | 1 | Check number 2515 (attempted deposit) | | $5500 |
| 10/4/2023 | 1 | Check number 2516 | $4500 | |
| 10/4/2023 | 1 | Check number 2517 (torn up by Onwumere) | | $5500 |
| 10/5/2023 | 1 | Check number 41882 | $41000 | |
| 10/6/2023 | 1 | Check number 41889 | $41000 | |
| 10/22/2023 | 1 | Attempted loss based on the same scam on Victim 2 | | $22500 |
| 6/15/2023 | 2 | Check number 988102 | $15500 | |
| 9/28/2023 | 2 | Check number 883502808 | $11850 | |
| 10/23/2023 | 2 | Check number 88350289 | $11850 | |
| 11/2/2023 | 2 | Check number 996036 | $22500 | |
| 12/20/2023 | 2 | Fraudulent check | | $7000 |
| 1/2/2024 | 2 | Fraudulent check | | $13200 |
| Various | 2 | Gift card purchases | $9505 | |
| Various | 3 | Gift card purchases | $7000 | |
| Various | 5 | Checks | $41000 | $7500 |
| 6/13/2023 | 6 | Check | $37500 | |
| 8/3/2023 | 7 | Check | $3000 | |

| | | | | |
|---|---|---|---|---|
| 8/30/2023 | 8 | Wire Transfer | $1141 | |
| | | **TOTAL** | **$247,746** | **$61,200** |

Combined, the actual and intended losses total $308,946. Thus, the initial guideline loss calculation of more than $250,000 but less than $550,000 was correct, and this objection is **OVERRULED.**

### B. Defendant Acted on Behalf of Government Agency

Onwumere also objects to the PSR's application of U.S.S.G. § 2B1.1(b)(9)(A) for acting on behalf of a government agency. The guideline provides: "If the offense involved (A) a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization, or a government agency . . . increase two levels." U.S.S.G. § 2B1.1(b)(9)(A).

Victim 1 sent three personal checks to Onwumere's home, at least one of which was mailed in an envelope addressed to the FBI's Department of Payments/Fees. Onwumere attempted to alter one check made payable to the FBI in an attempt to deposit it into his wife's account. Onwumere was not aware of the law enforcement scam before he received these checks, nor did he represent himself to be an FBI agent before this. However, after receiving the checks, he attempted to deposit one of them, and in the following days, he and Abdalkareem deposited two other checks that the same victim sent to him. By continuing to accept and deposit money from a victim that Onwumere knew believed he and his wife were FBI Agents, he misrepresented that he was acting on behalf of a government agency. Direct communication to the victim is not necessary to apply the enhancement; actively participating in the scheme by accepting funds directed to an FBI Agent is sufficient. Therefore, this objection is **OVERRULED.**

### C. Minimal or Minor Role

Onwumere contends that a minor role adjustment pursuant to U.S.S.G. § 3B1.2 applies. A sentencing court may apply U.S.S.G. § 3B1.2 to reduce the base offense level if the defendant's role in the offense was "substantially less" than other perpetrators. U.S.S.G. § 3B1.2 n. 3(A). The minor role adjustment is a fact-based determination and the sentencing court may consider the following factors:

> (i) the degree to which the defendant understood the scope and structure of the criminal activity; (ii) the degree to which the defendant participated in planning or organizing the criminal activity; (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; (v) the degree to which the defendant stood to benefit from the criminal activity.

*United States v. Taylor*, 818 F. App'x 495, 501 (6th Cir. 2020).

As the Court noted at the hearing, this objection is **OVERRULED**. Though Onwumere did not know the entire scope and structure of the criminal activity, he was well-aware of the broad strokes. He understood the Nigerian coconspirators operated a romance scam, and after receiving checks addressed to the FBI, he also knew they operated law enforcement scams. That he did not know the specific messages sent to victims does not diminish his overall knowledge of the scope of the criminal activities. Further, he participated in the scam to the same degree as an average conspirator. He had direct communication with Coconspirator 1 in Nigeria, he received the victim's checks, deposited them into his accounts, and he recruited his wife into the conspiracy and directed some of her actions. Onwumere was essential to the conspiracy, and he did not hold a minor role.

**SO ORDERED:**

s/ Clifton L. Corker
United States District Judge